UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| SUSAN AWUGAH, )<br>                  )<br>     **Plaintiff**   )<br>                  )<br>v.                )<br>                  )<br>KEY BANK NATIONAL )<br>ASSOCIATION,     )<br>                  )<br>     **Defendant** )  | No. 2:12-cv-97-DBH |

### DECISION AND ORDER ON DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT

The defendant has moved for summary judgment under Maine's Whistleblower Protection Act ("WPA"). Following Maine cases I conclude that, viewing the facts in the light most favorable to the plaintiff as the non-moving party, she has sufficient evidence to withstand summary judgment. I therefore **DENY** the defendant's motion.

### Procedural Posture

Susan Awugah sued KeyBank National Association in Cumberland County Superior Court for firing her as an employee. Awugah asserted a cause of action under the WPA and the Maine Human Rights Act (the "MHRA," which provides the remedy for WPA violations, see Fuhrmann v. Staples Office Superstore E., Inc., 58 A.3d 1083, 1090 (Me. 2012)).[1] KeyBank removed the

---

[1] Initially Awugah alleged that she had been discriminated against on the basis of sex, race, and status as a childcare provider in violation of the MHRA. Compl. ¶ 24 (ECF No. 2-3). At a
*(continued next page)*

lawsuit to this court, asserting diversity jurisdiction. Notice of Removal (ECF No. 1). At the close of discovery and after a Local Rule 56 conference, KeyBank moved for summary judgment.

## ANALYSIS

The WPA provides:

> No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because . . . [t]he employee, acting in good faith . . . reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States . . . .

26 M.R.S.A. § 833(1)(A). In its recent decision in Fuhrmann, the Maine Law Court outlined its approach for evaluating WPA claims at the summary judgment stage:

> [W]e apply a three-step, burden-shifting analysis to determine whether (1) the employee has presented prima facie evidence of discrimination; (2) the employer has presented prima facie evidence of a legitimate, non-discriminatory reason for the adverse action; and, in response, (3) the employee has presented prima facie evidence that the employer's proffered reason is pretextual or untrue.

Id. at 1089 (citation omitted).

KeyBank argues that Awugah did not report anything, that she did not have reasonable cause to believe that anything she reported was a violation of a law, and that even if she engaged in protected activity, there was no causal link

---

Local Rule 56 conference, Awugah agreed that the WPA claim is her sole claim. See Report of Pre-Filing Conference Under Rule 56 at 1 (ECF No. 21).

between the activity and her termination. In doing so, KeyBank challenges both elements (1) and (3) under the Fuhrmann analysis.

*(1)    Did Awugah report what she had reasonable cause to believe was a violation of law?*

Awugah was a KeyBank customer service manager. Pl.'s Statement of Material Facts ("PSMF") ¶ 2 (ECF No. 27); Def.'s Reply to Pl.'s Statement of Material Facts ("Def.'s Reply") ¶ 2 (ECF No. 33). KeyBank used a "VeriFone" signature pad system to allow customers to complete transactions at the teller window electronically by entering either a signature or a personal identification number ("PIN") on the pad. Def.'s Statement of Material Facts ("DSMF") ¶ 8 (ECF No. 23); Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp.") ¶ 8 (ECF No. 26). KeyBank instructed Awugah that bank employees were not allowed to sign or otherwise indicate a customer's signature on the VeriFone pad without the customer's consent, and that doing so was prohibited because it amounted to fraud and forgery. PSMF ¶ 7; Def.'s Reply ¶ 7. Awugah in turn relayed this instruction to other employees. PSMF ¶¶ 8, 11; Def.'s Reply ¶¶ 8, 11. When Awugah returned from maternity leave in early January 2010, she was informed that a teller was misusing the VeriFone by asking other bank employees to draw a line or sign on the customer's behalf when the customer was not present. DSMF ¶ 10; Pl.'s Resp. ¶ 10. Later that day, the branch manager asked Awugah if it was the correct process for tellers to "put a squiggle on the VeriFone" instead of a customer's signature. PSMF ¶ 31; Def.'s Reply ¶ 31. Awugah replied that doing so was improper. PSMF ¶ 32; Def.'s Reply ¶ 32. The branch manager then admitted to Awugah that at a teller's

request she had signed the VeriFone on behalf of a customer. DSMF ¶ 14; Pl.'s Resp. ¶ 14; PSMF ¶ 33; Def.'s Reply ¶ 33. Awugah told her that signing on customers' behalf was a very serious issue amounting to forgery. DSMF ¶¶ 15-16; Pl.'s Resp. ¶¶ 15-16; PSMF ¶ 34; Def.'s Reply ¶ 34. Awugah told her branch manager that they had to report the issue to a District Operations Manager. DSMF ¶ 18; Pl.'s Resp. ¶ 18; PSMF ¶ 39; Def.'s Reply ¶ 39. The branch manager worried about reporting the abuse because she herself had signed the VeriFone on a customer's behalf, and asked aloud, "Why did [the teller] have me sign the VeriFone? Why would she put everyone's job in jeopardy . . . Why would she put my job in jeopardy?" PSMF ¶ 40; Def.'s Reply ¶ 40. Awugah and the branch manager nevertheless called the District Operations Manager, who was unavailable, and then called the Area Retail Leader, the branch manager's direct supervisor, and informed her of the VeriFone misuse. DSMF ¶ 19; Pl.'s Resp. ¶ 19; PSMF ¶ 41; Def.'s Reply ¶ 41. The Area Retail Leader agreed that it was a serious issue, and the three set up a conference call with the District Operations Manager for later that afternoon.[2] Id.

Those facts are sufficient to dispose of KeyBank's first two arguments on the summary judgment motion: (1) whether Awugah reported—on Awugah's version of the facts, she told the branch manager she had engaged in improper conduct and caused the branch manager to report the VeriFone misuse to

---

[2] The parties dispute whether the branch manager alone made these calls, but I take Awugah's version, which is that "*we* made a phone call to [the District Operations Manager]" and "*we* called [the Area Retail Leader]." Awugah Dep. at 63:23-25 (ECF No. 23-2) (emphasis added).

4

supervisors; and (2) whether Awugah had reasonable cause to believe she was reporting a violation of law—according to Awugah, KeyBank had taught her that it amounted to fraud and forgery.

### *(2)* *Was there a causal relation between Awugah's whistleblowing and her termination?*

Under the standard for establishing a prima facie case at Fuhrmann step (1), temporal proximity alone is enough to demonstrate a causal link between protected activity and adverse action. See Fuhrmann, 58 A.3d at 1091; Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 728 (Me. 2012) ("Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case." (citations omitted)).  In this case, Awugah was terminated in late January, less than four weeks after her initial conversation with the branch manager about VeriFone misuse.  Awugah's protected activity and subsequent termination were thus significantly closer in time than was the case in either Fuhrmann or Daniels, where closer to two months elapsed.  Accordingly, I conclude that Awugah has made out a prima facie claim under step (1) of Fuhrmann.

At step (2), the burden shifts to KeyBank, the defendant, to introduce sufficient evidence "'to enable a rational factfinder to conclude that there existed a nondiscriminatory reason'" for Awugah's termination. Meléndez v. Autogermana, Inc., 622 F.3d 46, 52 (1st Cir. 2010) (citations omitted).  Here, KeyBank has introduced evidence showing that Awugah was terminated because she had left an ATM vault unsecured for a second time, and that a

second failure to secure an ATM vault is generally grounds for termination under the bank's policies. DSMF ¶¶ 29-30; Pl.'s Resp. ¶¶ 29-30. KeyBank has thereby satisfied step (2) of <u>Fuhrmann</u>.

Accordingly, the burden shifts to Awugah at <u>Fuhrmann</u> step (3) to show evidence that KeyBank's proffered reason was pretextual or untrue, disguising the real reason, retaliatory animus over her whistleblowing activity. Awugah has presented the following. After the VeriFone misuse reporting, the branch manager told Awugah that in handling the VeriFone misuse matter, the branch manager and the Area Retail Leader would focus exclusively on the teller who had initiated the VeriFone misuse, and that they would watch that teller closely to find some other violation as a basis for terminating her. PSMF ¶ 62; Def.'s Reply ¶ 62. The branch manager herself remained very concerned about her VeriFone conduct and how it would affect her own job. PSMF ¶ 60; Def.'s Reply ¶ 60. On January 20, the teller in question was terminated on the grounds of twice failing to secure the bank's ATM vault. DSMF ¶ 34; Pl.'s Resp. ¶ 34. On the morning of January 25, Awugah was in the process of servicing the branch's ATM vault when an error message appeared on the screen. PSMF ¶ 81; Def.'s Reply ¶ 81. The branch manager worked with Awugah to resolve the error. PSMF ¶ 82; Def.'s Reply ¶ 82. While Awugah was on the phone with ATM support, a co-worker came in and asked Awugah to help retrieve a combination for a new teller. PSMF ¶ 82; Def.'s Reply ¶ 82. The branch manager told Awugah to assist her co-worker and took over the phone conversation with ATM support, and Awugah left the room to assist. PSMF ¶ 83; Def.'s Reply ¶ 83. When Awugah returned to the ATM room, the branch

manager told her that she was done and that the ATM was all set. PSMF ¶¶ 84-85; Def.'s Reply ¶¶ 84-85. The branch manager also told Awugah that the ATM was secured and that she had locked and spun it, and Awugah did not check the ATM. PSMF ¶ 85; Def.'s Reply ¶ 85. Later that morning, Awugah received a call from her newborn child's daycare center that the child was not feeling well; with the branch manager's encouragement, Awugah left work early. PSMF ¶ 86; Def.'s Reply ¶ 86. When Awugah arrived at work the next day, the branch manager informed her that the ATM vault had been left unsecured the previous night. PSMF ¶ 88; Def.'s Reply ¶ 88. The branch manager further informed Awugah that she had reported the unsecured ATM to Human Resources. PSMF ¶ 91; Def.'s Reply ¶ 91.

On January 25, the very day the ATM was left unsecured, the branch manager called the District Operations Manager to report that Awugah was responsible for leaving the ATM vault unsecured; the District Operations Manager in turn instructed the branch manager to contact Human Resources, which she did. DSMF ¶¶ 39-40; Pl.'s Resp. ¶¶ 39-40; PSMF ¶ 92; Def.'s Reply ¶ 92. The District Operations Manager later contacted the Area Retail Leader and informed her that Awugah had failed to secure the vault, and that this was in fact Awugah's second incident of leaving a vault unsecured. DSMF ¶ 42; Pl.'s Resp. ¶ 42. (Awugah had previously received an incident report for failing to secure a vault in 2007; in her conversation with Human Resources, the branch manager requested a copy of this earlier report. DSMF ¶¶ 36, 44; Pl.'s Resp. ¶¶ 36, 44.) In an email to Human Resources detailing the current incident, the branch manager failed to mention her own involvement in the

7

ATM servicing. PSMF ¶¶ 102-104; Def.'s Reply ¶¶ 102-104. Other than the branch manager's email, Human Resources gathered no further information regarding Awugah's version of the events, and never learned of Awugah's claim that the branch manager came into the bank and took over the servicing of the ATM on January 25. PSMF ¶¶ 106-107; Def.'s Reply ¶¶ 106-107. Human Resources ultimately recommended Awugah's termination based solely on the information received from the branch manager. PSMF ¶ 109; Def.'s Reply ¶ 109. The Area Retail Leader agreed. DSMF ¶ 49; Pl.'s Resp. ¶ 49. On January 29, the branch manager informed Awugah that she was being terminated for the ATM incident. DSMF ¶ 53; Pl.'s Resp. ¶ 53; PSMF ¶ 111; Def.'s Reply ¶ 111. Awugah argues that from this evidence a factfinder could find that her alleged failure to secure the ATM vault was a pretext used by the branch manager to get rid of her for her VeriFone reporting and that the branch manager engineered Awugah's termination.

I conclude that Awugah has presented admissible evidence that she was in fact not responsible for leaving the ATM vault unsecured and that the branch manager knew this. Although the branch manager did not make the ultimate termination decision, under the so-called rubber stamp or "cat's paw" theory Awugah can establish that the unsecured ATM was a pretext for discrimination "by showing the discriminatory motivations of a supervisor [here, the branch manager], even though the supervisor did not formally take the adverse employment action." Harlow v. Potter, 353 F. Supp. 2d 109, 117 (D. Me. 2005) (citing Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77 (1st Cir. 2004)). "To invoke the cat's paw analysis, [Awugah] must submit evidence

sufficient to establish two conditions: (1) that [the branch manager] exhibited discriminatory animus; and, (2) the final decisionmakers . . . acted as the conduit of [the branch manager's] prejudice." Id. at 115 (citations omitted).

Addressing these conditions in reverse order, I find that Awugah has produced evidence to show that the final decisionmakers acted solely because of what they learned from the branch manager—namely, her report to Human Resources, the District Operations Manager, and the Area Retail Leader, that Awugah was responsible for the unsecured ATM vault. If the branch manager lied about Awugah's role in the failure to secure the ATM vault, a factfinder could find that the manager's mendacity suffused and tainted the ensuing decision to terminate Awugah. See Cariglia, 363 F.3d at 88 ("If the district court finds that [the plaintiff's supervisor] withheld exculpatory information . . . and thus impermissibly tainted the decisionmaking process with his animus, [the plaintiff] has shown that '[the supervisor's] discriminatory animus contributed significantly to [the plaintiff's termination], that it was a material and important ingredient in causing it to happen.'" (citation omitted)); Harlow, 353 F. Supp. at 118 (describing Cariglia as concluding that "an employee's termination could be 'impermissibly tainted' with a subordinate's animus, if the subordinate concealed relevant information or fed false information to the neutral decisionmakers").

The remaining question is whether a factfinder could find that the branch manager lied *because of her discriminatory animus* against Awugah— *i.e.*, in retaliation for Awugah's reporting of the VeriFone misuse, which resulted in the need to report the branch manager's own misuse to superiors.

9

A plaintiff bringing a WPA claim

> does not need to "convince the court on summary judgment that she *was* subjected to an adverse employment decision because of her protected [report], or even that her version of events is more plausible." She need only present sufficient evidence to raise an issue of fact regarding whether her WPA-protected report "was a substantial, even though perhaps not the only, factor motivating [her] dismissal."

Fuhrmann, 58 A.3d at 1093 (citations omitted). The First Circuit recently emphasized in Kelley v. Corr. Med. Servs., Inc., 2013 WL 450560, at *8 (1st Cir. Feb. 6, 2013), that these types of plausibility decisions are for the factfinder, not summary judgment.

Nevertheless, this is a very close call. Unlike Fuhrmann, where the plaintiff introduced evidence that her supervisor asked another employee to identify who had "ratted him out" after the plaintiff submitted an internal report of a company policy violation, 58 A.3d at 1092, Awugah has introduced no written or oral statements indicating a retaliatory animus on the part of the branch manager or any other KeyBank employee toward her. Also unlike Fuhrmann, where the supervisor was disciplined partly for practices reported by the plaintiff, there is no evidence suggesting that the branch manager or any other employee except the teller was actually disciplined for the VeriFone misuse.

On the other hand, Awugah's evidence suggests that she was terminated because her supervisor lied about her role in the unsecured ATM vault on January 25. A factfinder could find that such a lie was a pretext for something. It is possible and perhaps even probable that the branch manager lied for some non-retaliatory reason—KeyBank, for instance, suggests that she

"pointed the finger at [Awugah] to save her own skin from an Incident Report for failing to secure the vault," Def.'s Reply to Pl.'s Am. Filings and Supplemental Mem. at 11 (ECF No. 41). But the branch manager's willingness to implicate Awugah falsely might also be taken as proof of a retaliatory animus. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." (citation omitted)). Given that Awugah was terminated within four weeks of telling her branch manager that she must report the VeriFone misuse, that the branch manager was concerned about her own job security in the wake of the report, that the branch manager used an unsecured ATM vault as a reason to dismiss the teller who had initiated the VeriFone misuse, and that the branch manager reported falsely that Awugah too was responsible for an unsecured ATM vault, a factfinder could infer that retaliation for Awugah's whistleblowing about VeriFone misuse was a substantial motive for the branch manager to lie about Awugah's role in failing to secure the ATM vault and thereby get rid of Awugah. Under Fuhrmann and Kelley, it is immaterial whether this is the most plausible interpretation; Awugah has introduced enough evidence to raise genuine issues of material fact as to whether the branch manager reported her as a pretext for retaliation.

## CONCLUSION

For the foregoing reasons, I **DENY** the defendant's motion for summary judgment.

**SO ORDERED.**

**DATED THIS 12TH DAY OF MARCH, 2013**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**
